CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED
OCT 25 2005
JOHN F. CORCORAN, CLERK
BY: /s/ H. McDonald
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| DEVINCHE ALBRITTON, #317524, ) | |
| Plaintiff, ) | Civil Action No. 7:05-cv-00384 |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| LISA EDWARDS, et al., ) | By: Hon. Jackson L. Kiser |
| Defendants. ) | Senior United States District Judge |

Plaintiff DeVinche Albritton, #317524, a Virginia inmate proceeding pro se, brings this action under the Civil Rights Act, 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343. In his complaint, Albritton alleges that the defendants forced him to reside in a smoking pod, denied him unfettered access to the law library, denied him adequate medical care, and conspired to charge and convict him of fabricated disciplinary charges. Upon review of the record, I conclude that the plaintiff has not stated a claim upon which relief can be granted. Therefore, I dismiss the complaint without prejudice, pursuant to 28 U.S.C. § 1915A(b)(1).

I.   **Allegations and Claims**

In his complaint, Albritton alleges that on December 8, 2004, he was transferred to the Dillwyn Correctional Center and placed in the Reception and Orientation Building until orientation was over on December 13, 2004. Thereafter, per institutional policy, he was placed in a smoking unit. Albritton states that he informed multiple correctional officers that he did not smoke and "could not stand to breathe the smoke." However, he was informed that due to limited non-smoking pods, all inmates were placed in smoking units initially and those that requested a non-smoking pod were placed on the waiting list for a vacancy. Additionally, Albritton alleges he

was informed that if he had a medical condition requiring immediate placement in the non-smoking pod, he must make a request to be examined by the medical staff. Then, if the medical staff determine that an inmate has a medical reason necessitating immediate placement in a non-smoking unit, then that inmate will not be placed on the waiting list, but will instead receive an immediate transfer. Albritton made such a medical request on December 14, 2005, and admits that on December 15, 2004, he was examined by medical staff, questioned as to his use of tobacco products, and thereafter transferred. However, Albritton was charged a $5.00 medical fee for the examination.

Second, Albritton alleges that throughout his incarceration at Dillwyn Correctional Center defendants have refused to allow him sufficient time in the law library to pursue his criminal appeal and civil rights claims. However, he admits that he was given daily and sometimes twice daily access to the law library. But he claims that he needed additional time to "focus," and thus made numerous requests to have more time in the law library or be permitted to visit the law library more often, all of which were denied. Yet, he admits that even while making requests for more time he arrived late, left early, or missed multiple scheduled sessions.

Third, Albritton alleges he was denied adequate medical care on April 21, 2005. Albritton claims that on that day, he was in the prison medical unit to have blood drawn. While his blood was being processed, Albritton state that he asked the nurse to examine a sore which had appeared on his face about two days earlier. Albritton believed the sore was either a pimple or a spider bite. He claims that the nurse did in fact examine the sore, but would not clean the area or prescribe any medicine to prevent pain and/or infection. As he was leaving the medical unit Albritton noticed Nurse Dandridge and another nurse, he showed them his sore, asked that they

clean the sore, and requested a prescription for medication to limit pain and infection. At that time, Nurse Dandridge informed Alrbitton that if he wanted to have medical staff examine and clean his sore, he would need to submit a written request for medical attention and would be charged for a medical exam. However, she suggested that Albritton clean the area with warm soapy water and cover the sore with a band aid. Nurse Dandridge then gave Albritton three free band aids and he left the medical unit. On his way to his cell, Albritton saw the prison physician. Albritton approached the doctor, explained his medical need, and told the doctor he would like some type of "cream" to put on the sore. Albritton admits the doctor stated that he would not be able to prescribe any cream without first conducting an exam. Albritton followed the doctor back to the prison medical unit, the doctor entered a room and shut the door, and Albritton waited outside. Albritton states that he thought the doctor was going to exam him free of charge, but that when Nurse Dandridge saw him she became angry that he refused to follow her direction to make a written request for a medical examination and she informed him that now, in addition to the $5.00 fee for the earlier visit, he would be charged $2.00 for the band aids. Albritton then left the medical unit. He claims that it took three weeks for the sore to completely heal, but admits that during that time he made no requests for medical attention related to that sore.

Fourth, Albritton claims that correctional officers conspired with each other and Inmate Abrams to fabricate charges against Albritton in response to his continued grievances, requests for more time in the law library, and for pursuing his criminal appeal and civil rights claims. Specifically he alleges that on June 6, 2005, the law librarian instigated a confrontation between Albritton and Inmate Abrams during the afternoon law library session. Following that confrontation, Albritton claims that he returned to his cell to complete his afternoon job duties.

3

All inmates are required to report to the floor officer their name and bed number once they have completed their job. However, as Albritton was late completing his task, the floor officer had already left his pod, and was taken names in another pod. Inmates are only allowed in their assigned pod, however because Albritton "had" to report his name to the officer, he yelled through the door of the other pod his name and number. He claims that the reporting officer never looked up at Albritton, but just nodded that she had gotten his name. Thereafter, Albritton received a disciplinary charge for being in an unauthorized area because he entered a pod to which he was not assigned; and, following a disciplinary hearing on June 23, 2005, Albritton was sentenced to serve 10 days in isolation.

Because of the confrontation on June 6, 2005, on June 7, 2005, Albritton requested that the law librarian separate he and Inmate Abrams; however the law librarian refused to switch Inmate Abrams to another law library session. On June 8, 2005, Albritton reported his complaint to his inmate counselor, Kensly. Albritton then alleges that Kensly spoke personally with the law librarian who again refused to switch Inmate Abrams to another law library session. Immediately thereafter, Albritton informed correctional officers that Inmate Abrams was harassing and threatening him. On the same day, when he arrive at his scheduled law library session, Albritton claims that the only available seat was next to Inmate Abrams. Again Albritton voiced his complaints to the law librarian. Albritton then claims the law librarian told him that she was tired of his complaints and reported his failure to follow her directions to correctional officers. Subsequently, Albritton was removed from the law library and placed in isolation. While he was in isolation, his personal belongings were boxed and inventoried. During the inventory, after receiving the combination from Albritton and opening his inmate locker, correctional officers

4

discovered contraband pornography. Albritton was subsequently charged and convicted for possessing contraband and sentenced to ten days in isolation.

## II.     Analysis

A petition may be dismissed under 28 U.S.C. § 1915A(b)(1) if it is clear from the petition that the plaintiff is not entitled to relief. To state a cause of action under § 1983, a plaintiff must establish that he was deprived of rights guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. See West v. Atkins, 487 U.S. 42 (1988).

### A.     Smoking Pod Assignment

Inasmuch as Alrbitton's claim that he was intentionally assigned to a smoking pod when he was a non-smoker can be construed as a living conditions claim, it fails. While the Eighth Amendment does protect prisoners from cruel and unusual living conditions, an inmate is not entitled to relief simply because of exposure to uncomfortable, restrictive, or inconvenient conditions of confinement, for, "[t]o the extent that such conditions are restrictive or even harsh, they are part of the penalty that criminal offenders pay for their offenses against society." Rhodes v. Chapman, 452 U.S. 337, 347 (1981). As a result, in order to state a claim of constitutional significance regarding prison conditions related to environmental tobacco smoke ("ETS"), a plaintiff must demonstrate that due to the exposure he has sustained a serious or significant mental or physical injury and that prison officials were deliberately indifferent to such health threats. Wilson v. Seiter, 501 U.S. 294 (1991); Strickler v. Waters, 989 F.2d 1375, 1380-1381

5

(4th Cir. 1993). Furthermore, to prove an Eighth Amendment violation based on a serious risk of future harm related to exposure to ETS, a plaintiff must show that he was exposed to unreasonably high levels of ETS, that modern society will not tolerate any exposure to this risk, and that prison officials were deliberately indifferent to this risk. Helling v. McKinney, 509 U.S. 25, 35-36 (1993).

While his initial assignment to a smoking pod may have been inconvenient and unfortunate, Albritton has not demonstrated that, because of those conditions, he has sustained a serious or significant injury. Albritton admits that he only spent two days in the smoking pod before he was placed in a non-smoking unit. During his confinement in the smoking pod, he allege only that his eyes became irritated and that he suffered from bouts of coughing, a headache, and a sore throat, none of which he made any further complaint of once he was relocated. Although, this mild physical reaction may have been uncomfortable, it was of limited duration and caused no significant harm.

Furthermore, Albritton has failed to allege facts which suggest that he is at risk of future harm related to his limited exposure to ETS. In Helling, the court found that a prisoner who had previously been celled with a "five-pack-a-day" smoker, was not subject to a serious risk of future harm related to any exposure to high levels of ETS while housed in that cell because his exposure was not prolonged and he had since been transferred to another cell. Id. at 36. Here, plaintiff admits that he resided in a smoking pod for, at most, two days. He does not allege that he was ever forced to share a cell with a smoker, much less one who smoked five packs a day. Assuming arguenndo that plaintiff was exposed to high levels of ETS, his exposure was so brief he cannot establish that he is at future risk of harm. See Id.

6

Additionally, even if Albritton could establish that he faced some future risk of harm due to ETS, he has not presented any evidence which establish that prison officials ignored his plight. Albritton admits that he was told numerous times that all prisoners are initially assigned to smoking pods because of lack of space in the non-smoking units. However, he was told that if he had a medical condition which necessitated placement in a non-smoking pod, he need only contact the medical unit for an examination and referral. As Albritton admits that he did not contact the medical unit to request a medical exam until December 14, 2004, was seen on December 15, 2004, and transferred to a non-smoking pod the same day it is clear that prison officials acted promptly to remove Albritton from the smoking pod and were not deliberately indifferent to a known health risk.

Finally, although Albritton claims that he was improperly charged for the medical examination necessary for his immediate placement in the non-smoking unit, he does not dispute that he was specifically informed that he would be charged $5.00 for a medical evaluation, he then made a written request for a medical examination, and was in fact examined. Accordingly, as prisoners' are not entitled to entirely free medical care, as Albritton was informed of the prison's co-pay policy before he requested a medical exam and as he still requested an exam, and was in fact examined by medical personnel, he has failed to raise a constitutional claim regarding the $5.00 payment. See Johnson v. Dep't of Pub. Safety & Corr. Serv., 885 F.Supp. 817 (D. Md. 1995).

Accordingly, all of Albritton's claims stemming from his original placement in a smoking unit and subsequent transfer to a non-smoking unit, including his claims regarding the medical co-pay, are dismissed pursuant to pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim

7

upon which relief may be granted.

### B. Access to Law Library

Albritton next claims that defendants have refused to provide him adequate access to the law library at Dillwyn Correctional Center, and in doing so have violated his First Amendment right to access to the courts.

Reasonable access by prisoners to both state and federal courts and to communicate with attorneys is a guaranteed right. Ex parte Hull, 312 U.S. 456 (1941); see Procunier v. Martinez, 416 U.S. 396 (1974). However, in addition to showing some interference with this right or some deficiency in the legal resources available to him, an inmate must produce evidence of actual injury or specific harm to some litigation involving a challenge to the conditions of his confinement or the fact of his confinement. Lewis v. Casey, 518 U.S. 343 (1996); Strickler v. Waters, 989 F.2d 1375 (4th Cir. 1993). In fact, in order to state a claim, an inmate must come forward with something more than vague and conclusory allegations of harm. He must point to some specific harm flowing from the alleged deficiency in the legal resources available to him or his ability to communicate with counsel. Lewis, supra.

In this instance it is clear that Albritton has not suffered any actual harm. Albritton has not suggested that because of the restricted law library sessions he has missed any court imposed deadlines, rather he states only that he needed more time in the law library so he was not "sidetracked by other ideas or loss of thought." However, he admits that he was afforded daily, and sometimes twice daily, opportunities to work in the law library. He further admits that although limited in duration, he was still afforded access to legal materials and research during

8

his two, ten day confinements in isolation. But, he complains that this was insufficient time to allow him to adequately research all his potential defenses in his criminal appeal as well as to address all his potential civil rights claims. Yet, he admits that he was late, left early, or failed to appear at many of his scheduled law library sessions. Furthermore, due to his numerous filings in this court as well as his admissions that he has filed numerous pleadings in a pending civil action in the Eastern District and on his own behalf in his criminal appeal, it is clear that his efforts to communicate with the courts were not hindered. As such, Albritton has failed to demonstrate any actual injury or specific harm resulting from any action on the part of the defendants relating to his right to access the courts. Therefore, this claim will be dismissed pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### C.     Medical Care

Next, Albritton alleges that the defendants denied him adequate medical care in violation of the Eighth Amendment by refusing to fully examine and treat a sore which appeared on his face. In order to state a cognizable claim for denial of medical care under the Eighth Amendment, a plaintiff must allege facts sufficient to demonstrate a deliberate indifference to a serious medical need. Estelle v. Gamble, 429 U.S. 97, 104 (1976). To establish deliberate indifference, a plaintiff must present facts to evince that the defendant had actual knowledge of and disregard for an objectively serious medical need. Farmer v. Brennan, 511 U.S. 825 (1994); see also, Rish v. Johnson, 131 F.2d 1092, 1096 (4th Cir. 1997). "'A serious medical need' is 'one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Shelton v. Angelone, 183

9

Case 7:05-cv-00384-JLK-mfu   Document 30   Filed 10/25/05   Page 9 of 14   Pageid#: 179

F.Supp.2d 830, 840 (W.D.Va. 2002) (quoting Cox v. District of Columbia, 834 F.Supp. 439, 441 (D.D.C. 1992). A claim regarding a disagreement between an inmate and medical personnel over diagnosis or course of treatment generally does not state a cognizable constitutional claim under the Eighth Amendment. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985). Moreover, claims of medical judgment are not subject to judicial review. Russell v. Sheffer, 528 F.2d 318 (4th Cir. 1975). Mere malpractice or negligence in treatment does not amount to a claim of constitutional significance. Estelle, 429 U.S. at 105-06.

Albritton alleges that although he complained to both nursing staff and the prison physician about his sore, they refused to examine or treat the sore. However, Albritton admits that while he was in the prison infirmary to have blood drawn, Nurse Dandridge did in fact briefly examine the sore, instructed him to wash the area with warm soapy water, and to cover the sore with a band aid, which she then provided free of charge. Additionally, he admits that Nurse Dandridge informed him that if he wished to have a prison physician examine the wound and prescribe medication, he needed to fill out a sick call request and pay a co-pay. Albritton never filed a sick call request to be examined, thus he cannot now claim that medical staff refused to treat his sore.

Furthermore, Albritton has not suggested that the sore on his face constituted a serious medical condition. He admits that he believed this "sore" was a probably just a pimple, but because he saw a spider in his cell he was concerned it may have been a spider bite. As he also admits that the sore was fully healed within three weeks of its formation, it appears that although the sore may have been uncomfortable, it did not present any serious health threat.

Additionally, it appears that Albritton's complaint regarding this incident stems from his

displeasure at being required to make a medical co-pay to have his sore examined when he was already in the medical center to have blood drawn by a nurse. As noted above, inmates are not entitled to free medical care, thus his displeasure at paying a $5.00 co-pay before being examined by a prison doctor does not present a constitutional claim. See Johnson, 885 F.Supp. at 820.

Finally, to the extent that Albritton believes that prison medical staff failed to recognize or treat his medical needs, such disagreement does not rise to the level of a federal constitutional violation. Rather, such a claim would arise, if at all, under state medical malpractice laws and does not present a colorable claim under § 1983. See Estelle, supra, at 105-106.

As such, I find that Albritton has failed to state a viable § 1983 claim as to any of the allegations related to the treatment of his sore. Accordingly, I find that these allegations must be dismissed pursuant to 28 U.S.C. § 1915A(b)(1) for failure to state a claim upon which relief may be granted.

### D. False Charges

Lastly, Albritton's allegations that correctional officers and Inmate Abrams conspired to cause a physical confrontation between Abrams and Albritton and made false disciplinary charges against Albritton, thereby causing his subsequent confinement in isolation, are also unavailing. Albritton claims that these violations amount to a deprivation of the due process rights afforded under the Fourteenth Amendment and constitute cruel and unusual punishment under the Eighth Amendment

Although the Fourteenth Amendment does afford prisoners some due process rights, when a defendant is lawfully convicted and confined to jail, he loses a significant interest in his liberty for

11

the period of the sentence. Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991). Such confinement is necessarily subject to the broad discretion of those parties managing the jail. Id. However, the confinement does not strip the inmate of all of his liberty interests. Id. "These interests will be generally limited to the freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Sandin v. Conner, 515 U.S. 472, 484 (1995). Changes "in a prisoners's location, variations of daily routing, changes in conditions of confinement (including administrative segregation), and the denial of privileges [are] matters which every prisoner can anticipate [and which] are contemplated by his original sentence to prison." Gaston, 946 F.2d at 343. Furthermore, such changes are necessarily functions of prison management that must be left to the broad discretion of prison administrators to enable them to manage prisons safely and effectively. Id.

In this case, Albritton fails to allege facts indicating that he has been deprived of any federally protected liberty interest without due process. Furthermore, his brief periods in isolation were reasonable based on his own reports to correctional officers and his disciplinary infraction convictions. Albritton was first placed in segregation on June 8, 2005, following his report to correctional officers that Inmate Abrams was threatening and harassing him during the law library sessions. Although he claims this was to punish him for exercising his constitutional rights, he admits that he made multiple verbal and written requests that he be physically separated from Inmate Abrams. And even if the means of separation may have been different that Albritton envisioned, based on Albritton's report correctional officers could have reasonably believed that he was under threat of physical injury and should be placed in isolation. Furthermore, it is clear that Albritton

12

remained in isolation because he was subsequently charged with possession of contraband pornography. Albritton alleges that correctional officers or inmates planted this contraband in his cell, however he does not contest that the contraband was discovered in his locker which was only opened after he provided the combination to correctional officers. Accordingly, it is clear that there were sufficient grounds to charge and convict Albritton with possessing contraband.

Albritton's second confinement in isolation was also subsequent to a disciplinary charge conviction. On June 23, 2005, Albritton was convicted for entering an unauthorized area on June 6, 2005. Again, he claims that this charge was false, however he admits that he entered the threshold of a pod to which he was not assigned. Accordingly, it is clear that there was some evidence on which to charge and convict Albritton.

However even assuming that the correctional officers made false reports resulting in his confinement in isolation, such violations of state procedural law do not implicate federal due process rights and are not cognizable under §1983.

Furthermore, as noted above, an inmate is not entitled to relief simply because of exposure to uncomfortable, restrictive, or inconvenient conditions of confinement, but must instead establish those conditions violate contemporary standards of decency and that he has sustained a serious or significant mental or physical injury. Rhodes, 452 U.S. at 347; Strickler, 989 F.2d at 1380-1381. As Albritton has not alleged anything to suggest that his brief periods in isolation violate contemporary standards of decency nor that because of the conditions he has sustained a serious or significant injury or is at risk of a future injury, I find he has failed to state a constitutional claim under the Eighth Amendment. Id.

Accordingly, all plaintiff's claims regarding the alleged conspiracy to charge and convict him with fabricated disciplinary infractions are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### III. Conclusion

Based on the foregoing, I find that Albritton has not presented any claims that constitute a violation of his constitutional rights. Therefore, I dismiss the complaint without prejudice for failure to state a claim, pursuant to 28 U.S.C. § 1915A(b)(1).

The plaintiff is advised that he may appeal this decision pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure by filing a notice of appeal with this court within 30 days of the date of entry of this Order, or within such extended period as the court may grant pursuant to Rule 4(a)(5).

The Clerk is directed to send certified copies of this memorandum opinion and accompanying order to plaintiff and to counsel of record for the defendants, if known.

**ENTER**: This 25th day of October, 2005.

Senior United States District Judge